## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KAREL BLALOCK,** | : | **No. 3:24-CV-0647** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **LT. CORELY,** *et al.,* | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Karel Blalock initiated the above-captioned *pro se* action under 42 U.S.C. § 1983,[1] alleging that multiple officials at the State Correctional Institution, Huntingdon (SCI Huntingdon) failed to protect him from an inmate assault. Upon required screening under 28 U.S.C. § 1915A(a), the court will dismiss in part Blalock's complaint.

## I.    BACKGROUND

At all relevant times to the instant lawsuit, Blalock was incarcerated at SCI Huntingdon. (Doc. 1 ¶¶ 19-49). He is now incarcerated at the Howard R. Young Correctional Institution in Wilmington, Delaware. (See Doc. 18).

Blalock recounts that he was transferred from another state prison to SCI Huntingdon on April 20, 2023. (Doc. 1 ¶ 19). According to records from the

---

[1] Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002).

Program Review Committee (PRC) attached to Blalock's complaint, he was placed in the Restricted Housing Unit (RHU) upon his arrival to SCI Huntingdon as an "Administrative Separation Transfer" in Disciplinary Custody (DC) status. (Doc. 1-14). That DC time was initially set to expire on January 20, 2024. (Id.)

The day after his arrival, Blalock alleges that he met with Lieutenant Corley from the security department and informed Corley of his fear of being assaulted at SCI Huntingdon. (Id. ¶ 20). According to Blalock, there was an inmate at SCI Huntingdon who had already made two attempts on Blalock's life—once "in the community" and once while they were housed together at SCI Smithfield. (Id.) Blalock asserts that he provided the inmate's first name, his "alias," and a physical description, and noted that he was "gang affiliated." (Id.) Blalock, however, does not specify when he provided this identification information to prison officials.

That same day, Blalock filed a grievance (#1030559) in which he claimed that his life was in jeopardy and that Lieutenant Corley and "other staff" were "brushing off" his efforts to seek protection. (Id. ¶ 21; Doc. 1-1). Blalock stated in this grievance that he "fear[ed] for his life in this facilit[y's general] population" because of the other "gangmember" inmate's presence. (Doc. 1-1). He sought a transfer to another facility and asked that Corley be removed from his security position because "the safety of inmates [was] clearly not a priority to him." (Id.)

2

Blalock's grievance was denied by the Facility Grievance Coordinator, Captain A. Eberling, (see Doc. 1-2), and the subsequent appeal was denied by the Facility Manager, Superintendent J. Rivello, (see Doc. 1-4).  In the Facility Grievance Coordinator's denial, Eberling noted that Blalock had "refused to divulge the name of the inmate" who allegedly represented a threat to him, so Lieutenant Corley could not request an administrative segregation.  (Doc. 1-2 at 1).  Eberling reasoned that by failing to identify the inmate who was perceived as a threat, "it is impossible for Lt. Corley to justify requesting a separation on [Blalock's] behalf."  (Id.)  Eberling also noted that Corley had recommended that Blalock "remain in the RHU" while his allegations were investigated and informed Blalock that only the PRC could decide to remove him from the RHU and send him to general population.  (Id.)

On first-level appeal, Superintendent Rivello reiterated that without Blalock providing the identity of the inmate he feared, prison officials in the security department could not "put in a separation" to ensure Blalock's safety.  (Doc. 1-4).  Rivello further noted that Blalock had "chosen to withhold the identity and other information regarding the inmate [he was] in fear of."  (Id.)

In his May 31, 2023 appeal to the Secretary's Office of Inmate Grievances & Appeals (SOIGA), Blalock—apparently for the first time—admitted that he did not know the last name of the other inmate, only that his first name was "Derrick"

and he "goes by (crack) [sic] now." (Doc. 1-5).  Blalock continued, "If you[] still

don't feel as though this is helpful enough, go ahead an[d] send me to [general]

population." (Id.)  He also restated his requests for transfer to a different facility

and for Lieutenant Corley to be removed from his security position.  (Id.)  On July

19, 2023, Chief Grievance Officer D. Varner (through Keri Moore) upheld the

lower-level grievance denials based on the reasoning in those denials.  (See

Doc. 1-6).  Varner "encouraged [Blalock] to cooperate with staff" regarding

identifying the inmate who allegedly posed a threat, and advised Blalock to

provide any additional information that may be relevant or helpful to the

appropriate prison staff.  (Id.)

On July 12, 2023, a week prior to receiving the SOIGA's final denial,

Blalock recounts that he was seen by the PRC, which included DSCS J. Spyker,

DSFM J. Kohler, and CCPM T. Strait.  (Doc. 1 ¶ 27).  He alleges that he

"explained to all three" individuals his "fear[] for his safety" and the "deplorable"

responses he received from officials throughout the grievance process.  (Id.)

Blalock asserts that his complaints were not "recorded or documented" as

allegedly required by prison policy.  (Id.)

On September 9, 2023, Blalock met with another security officer,

Lieutenant K.L. Strong.  (Id. ¶ 28).  Blalock alleges that, during this meeting, he

explained "all the issues involving the threat to his life" as well as the steps he

had taken "to try [to] get help." (Id.) He avers that, despite providing this information to Strong, he "was not given any help," was not placed in "protective custody status," nor was he given a "temporary z code (single cell status)" for protection. (Id.)

Two and a half weeks later, on the morning of September 26, 2023, Blalock was assaulted by another inmate—identified in Blalock's October 26 grievance appeal as "Curtis Young"—while in the RHU recreation cages. (Id. ¶ 29; Doc. 1-8; Doc. 1-10; Doc. 1-17 at 1). Young attacked Blalock with what is known in prison vernacular as a "bomb," consisting of "feces, vomit, urine, and semen" combined in a bottle, which mixture was thrown on Blalock. (Doc. 1 ¶ 29). According to Blalock, Young assaulted him to collect a bounty that was placed on Blalock by the inmate "Derrick" or "Derek," (nicknamed "Crack"), whom Blalock had previously expressed fear about and discussed with security officers. (Id.; Doc. 1-9).

After exhausting administrative remedies through grievance #1056213 following the attack, (see Docs. 1-8 through 1-13), Blalock filed his Section 1983 lawsuit in this court. He names fourteen defendants in his complaint: Lieutenant Corley, Lieutenant Strong, Captain Eberling, Superintendent Rivello, Lieutenant Campbell, Chief Grievance Officer Varner, Lieutenant J. Watt, Counselor N. Walters, Psych/PSS J. Helsel, DSCS Spyker, DSFM Kohler, CCPM Strait, Major

M. Yost, and Major W. House.  (Doc. 1 at 4-7).  He sues all Defendants in their individual and official capacities.  (Id.)  He alleges that he suffered "depression," "anguish, mental and emotional injury," and exposure to potential disease and infections.  (Id. ¶ 50).  He seeks the following relief: (1) a declaration that his constitutional rights were violated; (2) injunctive relief in the form of being removed from SCI Huntingdon; (3) compensatory damages in the amount of $100,000 as to each Defendant; (4) punitive damages of $100,000 as to each Defendant; and (5) payment of all legal fees.  (Id. ¶¶ 51-55).

## II.    STANDARD OF REVIEW

Courts are statutorily obligated to review, "as soon as practicable," unrepresented prisoner complaints targeting governmental entities, officers, or employees.  See 28 U.S.C. § 1915A(a).  One basis for dismissal at the screening stage is if the complaint "fails to state a claim upon which relief may be granted[.]"  Id. § 1915A(b)(1).  This language closely tracks Federal Rule of Civil Procedure 12(b)(6).  Accordingly, courts apply the same standard to screening a *pro se* prisoner complaint for sufficiency under Section 1915A(b)(1) as they utilize when resolving a motion to dismiss under Rule 12(b)(6).  See Grayson v. Mayview State Hosp., 293 F.3d 103, 109-10 & n.11 (3d Cir. 2002); O'Brien v. U.S. Fed. Gov't, 763 F. App'x 157, 159 & n.5 (3d Cir. 2019) (*per curiam*) (nonprecedential); cf. Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000).

In deciding a Rule 12(b)(6) motion to dismiss, courts should not inquire "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Nami v. Fauver, 82 F.3d 63, 66 (3d Cir. 1996). The court must accept as true the factual allegations in the complaint and draw all reasonable inferences from them in the light most favorable to the plaintiff. See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 229 (3d Cir. 2008). In addition to the facts alleged on the face of the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents" attached to a defendant's motion to dismiss if the plaintiff's claims are based upon these documents. Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)).

When the sufficiency of a complaint is challenged, the court must conduct a three-step inquiry. See Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016) (internal citations, quotation marks, and footnote omitted). At step one, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009) (alterations in original)). Second, the court should distinguish well-pleaded factual allegations—which must be taken as true—from mere legal conclusions, which "are not

7

entitled to the assumption of truth" and may be disregarded.  Id. (quoting Iqbal,

556 U.S. at 679).  Finally, the court must review the presumed-truthful allegations

"and then determine whether they plausibly give rise to an entitlement to relief."

Id. (quoting Iqbal, 556 U.S. at 679).  Deciding plausibility is a "context-specific

task that requires the reviewing court to draw on its judicial experience and

common sense."  Iqbal, 556 U.S. at 681.

Because Blalock proceeds *pro se*, his pleadings are to be liberally

construed and his complaint, "however inartfully pleaded, must be held to less

stringent standards than formal pleadings drafted by lawyers[.]"  Erickson v.

Pardus, 551 U.S. 89, 94 (2007) (citations omitted).  This is particularly true when

the *pro se* litigant, like Blalock, is incarcerated.  See Dooley v. Wetzel, 957 F.3d

366, 374 (3d Cir. 2020) (citation omitted).

## III.   DISCUSSION

Before addressing the sufficiency of Blalock's complaint, the court must

identify the claimed constitutional violations.  See Albright v. Oliver, 510 U.S.

266, 271 (1994) ("The first step in any [Section 1983] claim is to identify the

specific constitutional right allegedly infringed.");  Graham v. Connor, 490 U.S.

386, 394 (1989) (explaining that analysis of a Section 1983 claim requires

"identifying the specific constitutional right allegedly infringed by the challenged"

conduct).

Blalock plainly alleges Eighth Amendment failure-to-protect claims. (See Doc. 1 at 17 ¶ 46). Indeed, these claims are the essence of his Section 1983 lawsuit. He also posits that he is asserting a claim for "cruel and unusual punishment." (See id. at 18 ¶ 47). However, this assertion is based on the same allegations as his failure-to-protect claim and thus does not alter the proper characterization of his Eighth Amendment claims as "failure to protect."

It appears that Blalock is also attempting to assert a state-law claim of negligence with respect to prison officials' failure to contact the Pennsylvania State Police and pursue criminal charges against inmate Young. (See id. at 18 ¶ 48). Blalock additionally alleges that Defendants violated the Department of Corrections (DOC) "code of ethics," and asserts that he is bringing a state-law claim of "assumpsit" for violating "an implied promise of protection." (Id. at 18-19 ¶ 49).

Blalock's complaint is rife with material pleading deficiencies. The court will address these deficiencies in turn.

## A.   Personal Involvement

It is well established that, in Section 1983 actions, liability cannot be "predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted); see also Ashcroft v. Iqbal, 556. U.S. 662, 676 (2009) (affirming same principle in Bivens

9

context).  Rather, a Section 1983 plaintiff must plausibly plead facts that demonstrate the defendant's "personal involvement in the alleged misconduct." Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020).  Personal involvement can include direct wrongful conduct by a defendant, but it can also be demonstrated through evidence of "personal direction" or "actual knowledge and acquiescence"; however, such averments must be made with particularity.  Id. (quoting Rode, 845 F.2d at 1207).  Furthermore, it is equally settled that involvement in the post-incident grievance process alone does not give rise to Section 1983 liability.  See id. (affirming dismissal of claims against prison officials for lack of personal involvement when officials' "only involvement" was "their review and denial of [plaintiff]'s grievance"); Lewis v. Wetzel, 153 F. Supp. 3d 678, 696-97 (M.D. Pa. 2015) (collecting cases); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (nonprecedential); Alexander v. Gennarini, 144 F. App'x 924, 925 (3d Cir. 2005) (nonprecedential) (explaining that prisoner's claims against certain defendants were "properly dismissed" because the allegations against them "merely assert their involvement in the post-incident grievance process").

Blalock's first pleading error is that he does not plausibly allege personal involvement for multiple Defendants.  As to defendants Lieutenant Watt, Lieutenant Campbell, Major Yost, and Major House, these Defendants had no

interaction with Blalock until *after* Young's assault.  (See Doc. 1 at 12-16 ¶¶ 32-45, 49).  Thus, they logically had no personal involvement in failing to protect him from the attack by Young.  Moreover, it appears that Watt's only involvement was providing the initial grievance response following the September 26 incident. (See id. ¶ 36; Doc. 1-9).  However, involvement in the "post-incident grievance process" alone does not give rise to Section 1983 liability.  See Dooley, 957 F.3d at 374; Alexander, 144 F. App'x at 925.  The same rational applies to Chief Grievance Officer Varner, who merely denied Blalock's final appeal to the SOIGA in January 2024.[2]  (See Doc. 1-13).

## B.    Eighth Amendment Failure to Protect

"Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."  Bistrian v. Levi, 696 F.3d 352, 366 (3d Cir. 2012) (citation omitted), abrogated on other grounds by Mack v. Yost, 968 F.3d 311 (3d Cir. 2020).  Prison officials, therefore, have "a duty to protect prisoners from violence at the hands of other prisoners."  Id.

---

[2] Although Varner also denied Blalock's final appeal for his initial grievance, that denial had nothing to do with failing to implement protective measures for Blalock at SCI Huntingdon. (See generally Doc. 1-6).  Rather, Varner simply upheld the denials from Eberling and Rivello indicating that Blalock needed to provide more identification information if he wanted an administrative separation from another inmate. (See id.).  Blalock has not plausibly alleged how Varner's response at the SOIGA—which merely upheld Eberling's and Rivello's findings—played any role in failing to protect him at SCI Huntingdon.  Thus, Blalock's reliance on Varner's role in the grievance process alone is insufficient to establish personal involvement for Section 1983 liability.  See Dooley, 957 F.3d at 374; Alexander, 144 F. App'x at 925.  Moreover, as will be explained in detail below, Blalock failed to administratively exhaust any claim against Varner.

(alteration in original) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994)). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." <u>Farmer</u>, 511 U.S. at 834.

To state an Eighth Amendment failure-to-protect claim against a prison official, the inmate must plausibly allege that "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to [the prisoner's] health and safety, and (3) the official's deliberate indifference caused [the prisoner] harm." <u>Bistrian</u>, 696 F.3d at 367. In this context, deliberate indifference is a subjective standard; that is, "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." <u>Id.</u> (quoting <u>Beers-Ca</u>pitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001)). Actual knowledge or awareness of a substantial risk to an inmate's safety can be proven "in the usual ways, including inference from circumstantial evidence." <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 842).

At the pleading stage, Blalock has plausibly alleged a failure-to-protect claim against Lieutenant Corley, Lieutenant Strong, Captain Eberling, Superintendent Rivello, DSCS Spyker, DSFM Kohler, CCPM Strait, Counselor Walters, and Psych/PSS Helsel. With respect to these Defendants, Blalock has alleged with sufficient factual detail that he informed them of risk of attack from

12

another inmate, that no protective measures were taken, and that these officials'
deliberate indifference resulted in the September 26, 2023 assault by Young.

The other named Defendants, who lack personal involvement in the alleged
constitutional violation, cannot be said to have been the cause of Blalock's harm.
That is because, quite simply, they were not involved with Blalock's custody at
SCI Huntingdon until after the September 26 assault.  Thus, Blalock cannot state
an Eighth Amendment failure-to-protect claim against them because it cannot be
said that their alleged deliberate indifference caused his harm.  See Bistrian, 696
F.3d at 367.

### C.   Administrative Exhaustion

The Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e et
seq., requires prisoners to exhaust available administrative remedies before
suing prison officials for alleged constitutional violations.  See id. § 1997e(a);
Ross v. Blake, 578 U.S. 632, 639, 642 (2016) (explaining that only "available"
remedies must be exhausted).  Proper exhaustion is mandatory, even if the
inmate is seeking relief—like monetary damages—that cannot be granted by the
administrative system.  See Woodford v. Ngo, 548 U.S. 81, 85 (2006).  The
exhaustion process is governed by the contours of the prison grievance system
in effect where the inmate is incarcerated.  Jones v. Bock, 549 U.S. 199, 218
(2007); see also Woodford, 548 U.S. at 90-91.

Pennsylvania's Department of Corrections (DOC) employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases.  See Booth v. Churner, 206 F.3d 289, 292 n.2 (3d Cir. 2002); COMMONWEALTH OF PA., DEP'T OF CORR., INMATE GRIEVANCE SYS., Policy No. DC-ADM 804 (May 1, 2015) (hereinafter "DC-ADM 804").  If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based."  DC-ADM 804 § 1(A)(3)-(5), (8).  An adverse decision by the grievance coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection.  Id. § 2(A)(1).  Finally, an adverse decision by the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals (SOIGA), and again must be submitted within 15 working days of the date of the Facility Manager's decision.  Id. § 2(B)(1).

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other conditions, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance sets forth "the specific relief sought,"

including "compensation or other legal relief normally available from a court." Id. § 1(A)(11).

Generally, failure to exhaust administrative remedies is an affirmative defense, not a pleading requirement. See Jones, 549 U.S. at 216. Nevertheless, when it is apparent from the face of the complaint that a plaintiff has failed to administratively exhaust a claim, dismissal may be appropriate based on "failure to state a claim." See Ball v. Famiglio, 726 F.3d 448, 460 (3d Cir. 2013), abrogated in part on other grounds by Coleman v. Tollefson, 575 U.S. 532 (2015). This includes *sua sponte* dismissal for failure to state a claim. See Ray v. Kertes, 285 F.3d 287, 293 n.5 (3d Cir. 2002) (citations omitted); Booth v. Churner, 206 F.3d 289, 290-91, 300 (3d Cir. 2000) (affirming district court's *sua sponte* dismissal where prisoner-plaintiff conceded in his complaint that he did not exhaust administrative remedies); Pena-Ruiz v. Solorzano, 281 F. App'x 110, 112 n.3 (3d Cir. 2008) (nonprecedential) ("Although failure to exhaust administrative remedies is generally an affirmative defense to be pleaded by the defendant, we have recognized that a district court has the inherent power to dismiss *sua sponte* a complaint . . . which facially violates a bar to suit.").

Here, Blalock attached detailed documentation to his complaint regarding administrative exhaustion of his failure-to-protect claim. (See Docs. 1-8 through 1-13). Notably, in his post-incident grievance (#1056213), he identifies the

following SCI Huntingdon officials as violating his Eighth Amendment rights for failing to protect him from Young's assault: "I've informed Security, PRC, Superintendent, P[s]ych, and my counselor prior to being assaulted that I feared for my life." (Doc. 1-8).  Under DC-ADM 804, an inmate is required to identify the individuals involved in the at-issue event or events.  DC-ADM 804 § 1(A)(11)(b).  Blalock complied with this requirement but only as to certain Defendants.  Under the most liberal construction, those Defendants include only Lieutenant Corley and Lieutenant Strong ("Security")[3]; DSCS Spyker, DSFM Kohler, and CCPM Strait ("PRC")[4]; Superintendent Rivello ("Superintendent"); Psych/PSS Helsel ("P[s]ych"); and Counselor Walters ("[Blalock's] counselor").

Thus, from the face of the complaint and the attachments thereto, it is clear that Blalock did not exhaust administrative remedies as to Captain Eberling, Chief Grievance Officer Varner, or Lieutenant Watt.  In particular, Blalock does not assert that any official involved with only his grievances (*i.e.*, Eberling, Varner, and Watt) violated his civil rights.  (See Doc. 1-8).  Consequently, to the extent that Blalock alleges sufficient facts to plead an Eighth Amendment claim against any of these Defendants (incidentally, only Eberling), any such claim

---

[3] While Blalock attempts to sue Lieutenant Campbell, who is also alleged to be security personnel, (see Doc. 1 ¶ 38), Blalock's allegations against Campbell do not state personal involvement in the failure-to-protect claim, as noted in Section III(A) above.

[4] Blalock attempts to sue other PRC members (*i.e.*, Major Yost and Major House) but, as noted in Section III(A), those Defendants had no personal involvement in the failure-to-protect claim.

16

must be dismissed under Section 1915A(b)(1) for failure to state a claim based on Blalock's patent failure to exhaust administrative remedies.  See Ball, 726 F.3d at 460; Pena-Ruiz, 281 F. App'x at 112 n.3.

### D.    Official Capacity Claims

As noted, Blalock sues all Defendants in their individual and official capacities.  However, any official capacity claim seeking monetary damages from state officials is barred by Eleventh Amendment sovereign immunity.

The Eleventh Amendment to the United States Constitution prevents federal courts from entertaining lawsuits—by United States citizens or citizens of foreign states—brought against a state.  U.S. CONST. amend. XI; Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267-68 (1997); Hans v. Louisiana, 134 U.S. 1, 10 (1890).  This immunity from private suit extends to state agencies as well as state officials acting in their official capacity because such lawsuits are essentially civil actions "against the State itself."  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).  States may waive this immunity if they choose, but Pennsylvania has explicitly not waived its immunity with respect to claims brought under Section 1983.  See 42 PA. CONS. STAT. ANN. § 8521(b); Downey v. Pa. Dep't of Corr., 968 F.3d 299, 310 (3d Cir. 2020); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 254 & n.5 (3d Cir. 2010) (citing 42 PA. CONS. STAT. § 8521(b)).  There are two exceptions to the Eleventh Amendment's bar to

private suits against nonconsenting states: (1) "Congress may abrogate a state's immunity" and (2) "parties may sue state officers for *prospective* injunctive and declaratory relief." Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n of Pa., 141 F.3d 88, 91 (3d Cir. 1998) (emphasis added) (citing, *inter alia*, Ex parte Young, 209 U.S. 123 (1908)).

Blalock's official capacity claims, to the extent they seek monetary damages, are barred by Eleventh Amendment sovereign immunity. His request for a declaration that his civil rights were violated is retrospective, rather than prospective, in nature. And, although Blalock seeks prospective injunctive relief in the form of a prison transfer, he has already been transferred out of SCI Huntingdon (the facility complained of) to a prison in Delaware. His claim for prospective injunctive relief, therefore, is moot because he has received the relief requested. See Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003) ("An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims."); see also Abdul-Akbar v. Watson, 4 F.3d 195, 197 (3d Cir. 1993). In sum, all official capacity claims will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1) and (2).

### E.    State-Law Claims

Blalock asserts state-law claims of negligence and "assumpsit." Neither of these claims survives Section 1915A(a) scrutiny.

Blalock first alleges that multiple prison officials were negligent for failing to contact the Pennsylvania State Police "so that charges could be filed" against Young. (Doc. 1 at 18 ¶ 48). Under Pennsylvania law, to establish the tort of negligence, a plaintiff must show that "the defendant owed a duty of care to the plaintiff, that duty was breached, the breach resulted in the plaintiff's injury, and the plaintiff suffered an actual loss or damages." Kinney-Lindstrom v. Med. Care Availability & Reduction of Error Fund, 73 A.3d 543, 563 n.17 (Pa. 2013) (quoting Merlini ex rel. Merlini v. Gallitzin Water Auth., 980 A.2d 502, 506 (Pa. 2009)).

Blalock's negligence claim plainly fails because he has not established any duty of care owed with regard to reporting the assault to the Pennsylvania State Police. Even if there were such a duty, Blalock has not plausibly alleged that he was injured by the purported breach of this duty or that he suffered actual loss or damages. Thus, his negligence claim must be dismissed. Dismissal will be with prejudice because granting leave to amend would be futile. Blalock has not, and cannot, allege facts that would establish injury or actual loss or damages stemming from Defendants' alleged failure to report the assault to the state police.

Blalock next alleges that DOC officials violated the department's "code of ethics," which code he contends "gives [him] an implied promise of protection by

all staff in the P.A. D.O.C." (Doc. 1 at 18-19 ¶ 49). He labels this claim as "assumpsit." (Id.)

As best as the court can ascertain, Blalock is asserting a claim sounding in breach of contract (*i.e.*, breaking an implied promise) based on the DOC's Code of Ethics. Indeed, Black's Law Dictionary defines "assumpsit" as a "common-law action for breach of [an express or implied] promise or for breach of contract." *Assumpsit*, BLACK'S LAW DICTIONARY (12th ed. 2024). See also Schriver v. Schriver, 316 A.3d 153, 160 (Pa. Super. Ct. 2024) (noting that claim regarding breach of a settlement agreement "sounds in assumpsit"); Birth Ctr. v. St. Paul Cos., 717 A.2d 376, 411 n.1 (Pa. 2001) (Zappala, J., dissenting) (noting that action of "assumpsit" is founded on a contract not a tort (citing BLACK'S LAW DICTIONARY 122 (6th ed. 1991))). Thus, Blalock's "assumpsit" claim alleging that prison officials breached an implied promise to protect him sounds in breach of contract rather than tort law.

Blalock, however, does not allege how the DOC's Code of Ethics provides a promise (express or implied) to protect him from assaults by other inmates. He does not cite any specific provision of the Code of Ethics, nor can the court independently ascertain a basis for such an alleged contractual duty. See generally COMMONWEALTH OF PA., DEP'T OF CORR., CODE OF ETHICS, https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-

us/doc-policies/Code%20of%20Ethics.pdf (last visited Aug. 26, 2024).  Moreover,

Blalock does not plausibly allege that he is a party to the DOC's Code of Ethics

such that he could maintain a breach of contract action based on that document.

See Butler v. Kauffman, No. 4:19-CV-02171, 2022 WL 2977337, at *11 (M.D. Pa.

July 27, 2022) (Brann, J.) (finding that prisoner-plaintiffs were not parties to

DOC's Code of Ethics and therefore could not assert a breach of contract claim

against prison officials based on alleged breach of that document), aff'd, No. 23-

1761, 2024 WL 1007444 (3d Cir. Mar. 8, 2024) (nonprecedential).  Nor has

Blalock alleged that he is an intended third-party beneficiary and that this

intention is expressly contained in the contract itself.  See Melley v. Pioneer

Bank, N.A., 834 A.2d 1191, 1202 (Pa. Super. Ct. 2003) (citation omitted).

Thus, assuming arguendo that the DOC's Code of Ethics could be

considered a "contract" under Pennsylvania law, Blalock has neither identified an

express or implied contractual duty breached by Defendants' conduct, nor has he

plausibly alleged that he is a party to this agreement or an intended third-party

beneficiary such that he can maintain a breach-of-contract claim in the first place.

Blalock's assumpsit claim, therefore, will be dismissed with prejudice pursuant to

Section 1915A(b)(1) as well.

## IV.   CONCLUSION

Based on the foregoing, the court will dismiss—pursuant to Section 1915A(b)(1)—the Section 1983 Eighth Amendment failure-to-protect claims against Captain Eberling, Lieutenant Campbell, Chief Grievance Officer Varner, Lieutenant Watt, Major Yost, and Major House.  The court will likewise dismiss all official capacity claims, as well as Blalock's state-law negligence and assumpsit claims.  This case will proceed only on the individual capacity Eighth Amendment failure-to-protect claims against Lieutenant Corley, Lieutenant Strong, Superintendent Rivello, Counselor Walters, Psych/PSS Helsel, DSCS Spyker, DSFM Kohler, and CCPM Strait.  An appropriate Order follows.

Date: 9/4/24

BY THE COURT:

JUDGE JULIA K. MUNLEY
United States District Court