**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KAREL BLALOCK,** | : | **No. 3:24-CV-0647** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **LT. CORLEY, *et al.*,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Plaintiff Karel Blalock initiated the above-captioned *pro se* action under 42 U.S.C. § 1983,[1] alleging that multiple officials at the State Correctional Institution, Huntingdon (SCI Huntingdon), failed to protect him from an assault by another inmate.[2] Presently pending is Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56. Because there are genuine disputes of material fact regarding Blalock's Eighth Amendment claim against several remaining Defendants, the court will grant in part and deny in part Defendants' Rule 56 motion.

---

[1] Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002).

[2] Blalock is currently incarcerated at the James T. Vaughn Correctional Center in Smyrna, Delaware. (See Doc. 37).

## I. BACKGROUND[3]

On April 20, 2023, Blalock was transferred to SCI Huntingdon as an administrative separation transfer from SCI Benner Township. (Doc. 65 ¶¶ 6-7; Doc. 65-2 at 2; Doc. 74 ¶ 2). He was immediately placed in the Restricted Housing Unit (RHU) in "Disciplinary Custody (DC)" status, which status was initially set to expire on January 20, 2024. (See Doc. 65 ¶ 7; Doc. 71-2 at 20).

The day after he arrived at SCI Huntingdon, Blalock claims that he met with Lt. Corley from the security department and informed Corley of his fear of being

[3] Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. "Statements of material facts in support of, or in opposition to, a motion [for summary judgment] shall include references to the parts of the record that support the statements." Id. Defendants filed a properly supported statement of material facts. (Doc. 65). Blalock attempted to file a responsive statement of material facts, but that document did not contain sufficient margins and thus was illegible as filed. (See generally Doc. 71). The court directed Blalock to refile his counterstatement of facts with appropriate margins, (see Doc. 72), and Blalock complied, (see Doc. 74). Blalock's counterstatement of facts, however, does not appropriately respond to the paragraphs in Defendants' statement of material facts, and it often lacks proper citation to record evidence. (See, e.g., Doc. 74 ¶¶ 2-6, 19, 20, 21, 24-32). This lack of citation to record evidence directly contravenes Local Rule 56.1. See Weitzner v. Sanofi Pasteur Inc., 909 F.3d 604, 613 (3d Cir. 2018) (explaining that Local Rule 56.1 "is essential to the Court's resolution of a summary judgment motion due to its role in organizing the evidence, identifying undisputed facts, *and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence*." (emphasis added) (internal quotation marks and citations omitted)). Blalock's failure to respond to Defendants' statements of fact and instead setting out his own version of events is likewise procedurally inappropriate. See Barber v. Subway, 131 F. Supp. 3d 321, 322 n.1 (M.D. Pa. 2015) (explaining that separate, nonresponsive statement of facts by nonmovant is "neither contemplated nor permitted by the Local Rules"). Defendants' material facts, therefore, are deemed admitted unless (1) properly rebutted by Blalock's counterstatements containing appropriate record citations, or (2) plainly contradicted by the record. See LOCAL RULE OF COURT 56.1.

assaulted or fatally attacked at SCI Huntingdon. (See Doc. 71-2 at 2). According to Blalock, another inmate allegedly housed at SCI Huntingdon who was "an active gang member" had already made "two attempts on [his] life"—once "in the streets" and once in another prison. (Id.) Blalock requested to be transferred out of SCI Huntingdon to a different prison. (See id. at 2, 5).

According to the contemporaneous grievance documents upon which Blalock repeatedly relies,[4] Blalock initially refused to identify the inmate he feared would assault or kill him. (See id. at 2, 3). Yet without this information, Lt. Corley could not request an administrative separation. (Id.) Lt. Corley further noted that Blalock was to remain in the RHU and that only the Program Review Committee (PRC) could determine when he would be released from the RHU. (Id.)

On first-level appeal, Blalock reiterated that he feared for his life "because there's an inmate here who shot me in the community and sliced up my face in prison who I know . . . will try [to] kill me again on sight." (Id. at 5). He claimed that he would not be safe at SCI Huntingdon and again requested transfer to another prison. (Id.) Superintendent J. Rivello—the Facility Manager—responded to Blalock's first-level grievance appeal and reiterated that without

[4] Blalock submitted these documents with his complaint, (see Docs. 1-1 through 1-13), as well as with his initial counterstatement of material facts, (see Doc. 71-2). He frequently relies on their contents as evidentiary support for his counterstatement of material facts. (See, e.g., Doc. 74 ¶¶ 8, 9, 10, 12, 13, 14, 16).

Blalock providing the identity of the inmate he feared, prison officials in the Security Department could not "put in a separation" to ensure Blalock's safety. (Id. at 6). Superintendent Rivello further noted that Blalock had "chosen to withhold the identity and other information regarding the inmate [he was] in fear of," and that because Blalock was "withholding the necessary information," Lt. Corley was "unable to proceed" until Blalock cooperated. (Id.) He encouraged Blalock to "work with the Security Department and cooperate to ensure they are able to properly protect" him. (Id.)

It does not appear that Blalock agreed to identify the inmate he feared until his final appeal to the Secretary's Office of Inmate Grievances and Appeals (SOIGA). In that May 31, 2023 final-level appeal, Blalock admitted that he did not know the last name of the inmate, only that his first name was "Derrick" and he "goes by (crack) [sic] now." (Id. at 8). On July 19, 2023, Chief Grievance Officer D. Varner upheld the lower-level grievance denials based on the reasoning in those denials. (See id. at 9). Varner "encouraged [Blalock] to cooperate with staff" to identify the inmate who allegedly posed a threat and advised Blalock to provide any additional information that may be relevant or helpful to the appropriate prison staff. (Id.)

On July 12, 2023, a week prior to receiving the SOIGA's final denial, Blalock met for a "periodic review" with the PRC, which included DSCS J.

Spyker, DSFM J. Kohler, and CCPM T. Strait. (Id. at 20; Doc. 65 ¶ 17). Although Blalock alleges in his complaint that he "explained to all three" individuals his "fear[] for his safety" and the "deplorable" responses he had received from prison officials, (see Doc. 1 ¶ 27; Doc. 74 ¶ 17), there is no record of this conversation on the PRC's DC-141 Part III form, (see Doc. 71-2 at 20). The PRC members decided to continue Blalock on DC status at that time. (See id.).

On September 6, 2023, Blalock met with another security officer, Lt. K. L. Strong. (See Doc. 65-2 at 2). Lt. Strong's subsequent report—dated September 14, 2023—confirmed that Blalock had initially refused to identify the inmate he feared would assault him. (Id.) The report then explained that Blalock had eventually described the other inmate to prison officials as a "dark skinned, heavy[-]set male a little taller than himself named Derek who is affiliated with the Bloods and known as 'Crack.'" (Id.) During the interview, Blalock recounted that he and Derek had a "street beef" during which Derek shot at Blalock, and that when both inmates were incarcerated at SCI Smithfield, Derek cut him twice on his face. (Id.) Blalock admitted that he had not seen Derek at SCI Huntingdon but had heard that Derek was incarcerated there from a source whom Blalock refused to identify. (Id.)

After the September 6 interview, Lt. Strong conducted a search, finding that three males at SCI Huntingdon had the first name "Derek." (Id.) Only two of those inmates were black. (Id.) Neither of the black male inmates, however, was dark skinned, gang-affiliated, or logged as having the nickname "Crack." (Id.) Furthermore, neither of the black male inmates named Derek had ever been incarcerated at SCI Smithfield. (Id.)

As part of the investigation, Lt. Strong also contacted the SCI Smithfield security office via email after her interview with Blalock. (Id.; Doc. 65-3 at 2-4). Lieutenant Robert Harper responded to Lt. Strong, explaining that there were no known incidents at SCI Smithfield involving Blalock where he was assaulted by another inmate. (Doc. 65-2 at 2; Doc. 65-3 at 4). Rather, Blalock's complaints while housed at SCI Smithfield primarily involved PREA allegations or staff misconduct. (See Doc. 65-2 at 2; Doc. 65-3 at 4). During his deposition, Blalock testified that he never reported the attack by Derek at SCI Smithfield and instead "patched [him]self up with some Vaseline in [his] wounds" because he feared being labeled a "snitch." (Doc. 65-1, July 7, 2025 Blalock Dep. 30:15-25 [hereinafter "Blalock Dep. __:__"]).

On the morning of September 26, 2023, Blalock was assaulted by another inmate—Curtis Young—while in the RHU recreation cages. (Doc. 65 ¶¶ 25-26; Doc. 71-2 at 15). Blalock describes the RHU recreation cages as "oversized dog

cages" lined up in a long row with a gate-like barrier between each cage. (See Blalock Dep. 13:7-18). Young attacked Blalock with what is known in prison vernacular as a "bomb," consisting of "feces, vomit, urine, and semen" combined in a bottle, which mixture Young threw on Blalock from a neighboring RHU recreation cage. (Doc. 65 ¶ 26; Doc. 71-2 at 11; Blalock Dep. 12:15-19). Blalock did not personally know Young and had never interacted with him prior to the attack. (Doc. 65 ¶ 3; Blalock Dep. 16:6-9).

During the attack, another RHU inmate—Armonti Womack—was present in the RHU recreation cages near Blalock and Young. (See Doc. 1-17 (Oct. 2023 Womack Affidavit)). Womack attests that after Blalock was attacked by Young and then escorted out of the recreation area, Womack asked Young why he had thrown the "bomb" on Blalock. (Id. at 1). According to Womack, Young responded that his "big homie" (that is, a higher-ranking gang member) had put a $2,500.00 bounty on Blalock's head and had told the lower-ranking gang members to "collect by any means necessary." (Id.) Womack then promptly informed Blalock about the bounty after leaving the RHU recreation area. (Id. at 1-2).

Immediately following the attack, Blalock was escorted by corrections officers to the strip cage and then permitted to take a shower and given new clothing. (Doc. 65 ¶ 28). He was also examined by the medical department. (Id.

¶ 29). As a result of the assault with various body fluids, Blalock claims that he suffered a skin rash and an eye infection, both of which were treated by SCI Huntingdon medical staff. (Id. ¶ 32; Blalock Dep. 18:13-19:8).

Blalock filed another grievance (number 1056213) on October 10, 2023. (See Doc. 71-2 at 11). In that grievance, he informed prison officials about the assault and that he had learned from Young (his attacker) that there was a $2,500.00 bounty on his head "placed by the inmate who [he] informed security about multiple times," presumably, the black male gang member named Derek with the nickname "Crack." (Id.)

After exhausting that grievance through appeal with the SOIGA, Blalock filed the instant lawsuit under 42 U.S.C. § 1983. (See generally Doc. 1). The court screened his complaint as required by 28 U.S.C. § 1915A(a), permitting the Eighth Amendment failure-to-protect claims to proceed against Lt. Corley, Lt. Strong, Superintendent Rivello, Counselor N. Walters, Psych/PSS J. Helsel, DSCS J. Spyker, DSFM J. Kohler, and CCPM T. Strait. (See generally Docs. 21, 22).

Those remaining Defendants now move for summary judgment under Federal Rule of Civil Procedure 56. (Doc. 54). Blalock filed a brief in opposition several months later. (Doc. 70). No reply brief has been filed and the time in which to do so has passed, so Defendants' Rule 56 motion is ripe for disposition.

## II. STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those "that could alter the outcome" of the litigation, and "disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 262 (3d Cir. 2010) (quoting Clark v. Modern Grp. Ltd., 9 F.3d 321, 326 (3d Cir. 1993)).

At the Rule 56 stage, the court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue. Liberty Lobby, 477 U.S. at 250-57; Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 587-89 (1986). A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 192 (3d Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 252) (alteration in original). Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party. Daubert v. NRA Grp., LLC, 861 F.3d 382, 391 (3d Cir. 2017) (quoting Berkeley Inv. Grp. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006)).

## III. DISCUSSION

Defendants assert that Blalock cannot proffer evidence to establish that he was incarcerated under conditions posing a substantial risk of serious harm or that any Defendant acted with deliberate indifference to a risk to Blalock's health or safety.[5] After careful consideration, the court finds that there are genuine disputes of material fact as to the failure-to-protect claims against four of the remaining eight Defendants.

[5] Defendants also argue that Superintendent Rivello is entitled to judgment as a matter of law because Blalock cannot establish a supervisory liability claim against him. (See Doc. 66 at 15-16). However, because Blalock never asserted a supervisory liability claim against any Defendant, (see Doc. 70 at 10), the court will not address this argument.

### A. Eighth Amendment Failure to Protect

"Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Bistrian v. Levi, 696 F.3d 352, 366 (3d Cir. 2012) (citation omitted), abrogated on other grounds as noted by Mack v. Yost, 968 F.3d 311, 319 n.7 (3d Cir. 2020). Prison officials, therefore, have "a duty to protect prisoners from violence at the hands of other prisoners." Id. (alteration in original) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834.

To establish an Eighth Amendment failure-to-protect claim against a prison official, the inmate must show that "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to [the prisoner's] health and safety, and (3) the official's deliberate indifference caused [the prisoner] harm." Bistrian, 696 F.3d at 367. In this context, deliberate indifference is a subjective standard; that is, "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Id. (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001)). Actual knowledge or awareness of a substantial risk to

an inmate's safety can be proven "in the usual ways, including inference from circumstantial evidence." Id. (quoting Farmer, 511 U.S. at 842).

Blalock repeatedly lumps together all the remaining Defendants when discussing his failure-to-protect claims against them. (See, e.g., Doc. 70 at 1, 2, 6, 7). Yet it is undisputed that different factual scenarios are associated with different Defendants. The court will therefore discuss the Eighth Amendment claims with an eye toward the relevant Rule 56 facts for each Defendant.

### 1. Defendants Walters and Helsel

The court first addresses defendants Counselor Walters and Psych/PSS Helsel. Any Eighth Amendment failure-to-protect claim against these Defendants fails at the summary judgment stage because there is no record evidence indicating that Walters or Helsel was aware of a significant risk of harm to Blalock or that they were deliberately indifferent to that risk. Although the court determined during Section 1915A(a) screening that Blalock's allegations sufficed to state an Eighth Amendment claim against Walters and Helsel, Blalock has pointed to no evidence in the Rule 56 record establishing the elements of a failure-to-protect claim against them. See FED. R. CIV. P. 56(c)(1)(A), (3). At summary judgment, a plaintiff "may not rest upon the mere allegations or denials of his pleadings but, instead, must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will

not suffice." Jutrowski v. Township of Riverdale, 904 F.3d 280, 288-89 (3d Cir. 2018) (quoting D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 268-69 (3d Cir. 2014)).

Blalock mentions Walters and Helsel in his counterstatement of facts in two paragraphs. In those paragraphs, he offers unsupported, conclusory allegations that Walters and Helsel were "made aware of [Blalock] being in danger," (see Doc. 74 ¶¶ 26, 27), and cites to "counselors [sic] weekly logs" and "psych logs," (see id.), neither of which have been proffered as evidence in this case. Simply put, Blalock's bare allegations with no supporting evidence are insufficient to meet his burden at summary judgment to demonstrate that there is a genuine dispute of fact for the Eighth Amendment claims against Walters and Helsel.

**2. Defendant Strong**

Blalock met with Lt. Strong on September 6, 2023, and informed her about how he feared for his life and was at risk of assault from inmate "Derek." But contrary to Blalock's contentions that Lt. Strong acted unconstitutionally, Lt. Strong took immediate action in response to his claims of fear. To wit: she promptly investigated Blalock's allegations by researching inmates at SCI Huntingdon with the first name "Derek" who could match the description he had provided. She also emailed security officers at SCI Smithfield, where Blalock

was previously incarcerated, to determine whether his claim of being attacked and cut by an inmate named "Derek" at that facility could be substantiated.

Notably, however, Lt. Strong's investigation returned no information that could corroborate Blalock's claims. Only two black males with the first name "Derek" were incarcerated at SCI Huntingdon, and neither of those inmates matched the description given by Blalock. Even more importantly, neither black male "Derek" had *ever* been incarcerated at SCI Smithfield and thus could not have physically assaulted Blalock there. Additionally, Lt. Harper from SCI Smithfield's security office confirmed in writing that there was no record of another inmate attacking Blalock while he was housed there. Thus, Lt. Strong reasonably could conclude that the inmate whom Blalock feared was not incarcerated at SCI Huntingdon, that Blalock's claims of fear of attack by "Derek" were unsubstantiated, and that Blalock could return to General Population upon completion of his disciplinary sanctions. (See Doc. 65-2 at 2).

Consequently, Blalock has not proffered any evidence that Lt. Strong had actual knowledge of a risk of serious harm to him. That is, Blalock has not shown that Lt. Strong was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that Lt. Strong had also "draw[n] the inference." Farmer, 511 U.S. at 837. In fact, the opposite is true. After interviewing Blalock and performing an investigation, Lt. Strong reasonably

concluded that a risk of serious harm *did not exist* because none of Blalock's claims could be substantiated. Lt. Strong could not even confirm that the "Derek" whom Blalock feared was a prisoner in SCI Huntingdon. When making a determination as to deliberate indifference, the court must "focus [on] what a defendant's mental attitude actually was . . . , rather than what it should have been[.]" Hamilton v. Leavy, 117 F.3d 742, 747 (3d Cir. 1997) (internal citation and quotation marks omitted).

Lt. Strong, moreover, cannot be found to have knowingly disregarded a risk of harm to Blalock; *i.e.*, she did not act with deliberate indifference to the alleged risk of harm presented by Blalock during his interview. Taking reasonable investigatory steps to substantiate a possible threat to an inmate's safety does not reflect deliberate indifference. See Farmer, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

The fact that Blalock ultimately was assaulted by a different inmate—Curtis Young—does not alter these conclusions in any way. See id. Nothing in the record shows that Young was on any prison official's radar (or even Blalock's

radar, for that matter) as a source of potential risk of harm to Blalock.[6] Furthermore, the record establishes that Blalock only learned of the alleged $2,500.00 bounty on his head from inmate Womack *after* the September 26, 2023 assault. There is simply no evidence that Blalock ever informed prison officials that other gang members or inmates besides "Derek" posed a significant risk of serious harm to him (by attempting to collect on a bounty or for any other reason) *before* he was attacked by Young. And while Blalock maintains that SCI Huntingdon officials should have known that other gang members posed a risk of serious harm to him, (see Doc. 70 at 2, 5 (alleging, without any evidentiary support, that Defendants knew Young was a gang member and thus should have known Young posed a risk to Blalock's safety)), that is not the standard for an Eighth Amendment violation. See Farmer, 511 U.S. at 837 (expressly rejecting an objective test for deliberate indifference and instead requiring prison officials to "know[] of and disregard[] an excessive risk to inmate health and safety"); Hamilton, 117 F.3d at 747.

---

[6] Although Blalock alleges that Defendants were made aware of the risk of harm of being in the vicinity of inmate Young, (see Doc. 70 at 2), he does not proffer any evidence to support this allegation. The only documents he cites (grievance materials attached to his complaint) make no reference to a risk of harm from any other inmate besides "Derek" or of a cash bounty until *after* the September 26, 2023 assault. (See id.; see also Docs. 1-1 through 1-13).

Blalock has failed to establish any of the elements of a failure-to-protect claim against Lt. Strong. Judgment, therefore, must be granted in Lt. Strong's favor.

**3. Defendant Rivello**

Blalock's failure-to-protect claim against Superintendent Rivello fails for two reasons. First, the only evidence proffered by Blalock regarding Rivello's role in the incident is the grievance appeal documents. Yet it is well settled that, in general, involvement in the grievance process alone does not give rise to Section 1983 liability. See Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020) (affirming dismissal of claims against prison officials for lack of personal involvement when officials' "only involvement" was "their review and denial of [plaintiff]'s grievance"); Lewis v. Wetzel, 153 F. Supp. 3d 678, 696-97 (M.D. Pa. 2015) (collecting cases); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (nonprecedential); Alexander v. Gennarini, 144 F. App'x 924, 925 (3d Cir. 2005) (nonprecedential) (explaining that prisoner's claims against certain defendants were "properly dismissed" because the allegations against them "merely assert their involvement in the post-incident grievance process").

Second, Blalock has failed to establish that Superintendent Rivello "knowingly and unreasonably disregard[ed] an *objectively intolerable* risk of harm." Farmer, 511 U.S. at 846 (emphasis added). Again, the only relevant

evidence Blalock proffered for this claim is his first grievance appeal and Rivello's response.[7]

Yet Rivello's response to the vague, unsubstantiated threat presented in Blalock's grievance appeal does not reflect deliberate indifference to an objectively intolerable risk of harm. Rather, Rivello explained that without Blalock providing the identity of the inmate he feared, prison officials in the security department could not put in a separation to ensure Blalock's safety. Rivello further noted that Blalock had chosen to withhold the identity and other information regarding the inmate he was in fear of, and that because Blalock was withholding the necessary information, Lt. Corley was unable to proceed until he cooperated. Rivello then encouraged Blalock to work and cooperate with the security officers to ensure they were able to properly protect him.

These responses do not reflect deliberate indifference to the unspecified threat raised by Blalock. Rather, they show that Rivello took Blalock's concerns seriously and that Rivello repeatedly admonished Blalock to cooperate with the security office so that they could implement adequate measures to protect him, like instituting a formal inmate separation between Blalock and the yet-to-be-identified inmate whom Blalock purportedly feared. This is a reasonable

---

[7] Although Blalock included copies of his second grievance (number 1056213) and its appeals, those documents postdate the September 26, 2023 assault and thus are largely irrelevant to the failure-to-protect claims.

response to Blalock's report of fear of attack from an unidentified inmate who may or may not have been housed at SCI Huntingdon.

Although Blalock requested a prison transfer and appears to believe that prison officials should have immediately transferred him out of SCI Huntingdon, simply because Rivello did not take the specific protective measure that Blalock requested does not mean that Rivello acted with deliberate indifference. A "reasonable" response to a risk of harm does not mean a perfect response. See Farmer, 511 U.S. at 844; Kansas v. Glover, 589 U.S. 376, 381 (2020) (explaining that "[t]o be reasonable is not to be perfect" (citation omitted) (alteration in original)). As the Third Circuit has explained, "prison officials are presented with an arduous task when asked to discern legitimate from illegitimate requests for protective custody" or transfer. Young v. Quinlan, 960 F.2d 351, 363 n.23 (3d Cir. 1992), superseded by statute on other grounds as stated in Nyhuis v. Reno, 204 F.3d 65, 71 n.7 (3d Cir. 2000). Indeed, "prisoners may feign their fear of physical harm simply to manipulate a transfer." Id. (quoting Mullen v. Unit Manager Weber, 730 F. Supp. 640, 645 (M.D. Pa. 1990)).

Here, Rivello was presented with Blalock's allegation that he feared for his life due to the potential presence of an unidentified gang member incarcerated at SCI Huntingdon who had previously assaulted him. Blalock was not in general population at that time; he was housed in the RHU and not scheduled to be

released to general population until January 2024. It was more than reasonable for Rivello to encourage Blalock to cooperate with security officers and identify the potential threatening inmate so that prison officials could take appropriate protective measures rather than transferring Blalock to another prison. See Mullen, 730 F. Supp. at 645 (finding that prison officials' decision not to transfer an inmate who claimed that he "feared for his life" but who did not disclose the identity of the inmates he feared was a "legitimate and reasoned one under the circumstances"). After all, Rivello could not even be sure that the inmate in question was housed at SCI Huntingdon so as to actually pose a legitimate threat to Blalock's safety. Blalock himself admitted that he had not seen this inmate at SCI Huntingdon but had only heard—through an undisclosed source—that he was housed there. (See Doc. 65-2 at 2). "Deliberate indifference can be inferred only where [a] defendant[] know[s] there is a *strong likelihood* rather than a mere possibility that violence will occur." Thomas v. Shutika, No. No. 4:12-CV-692, 2014 WL 2514817, at *5 (M.D. Pa. June 4, 2014) (emphasis added) (quoting Barrand v. Donahue, No. 3:06-CV-694, 2006 WL 2982051, at *2 (N.D. Ind. Oct. 16, 2006)); Watts v. Laurent, 774 F.2d 168, 172 (7th Cir. 1985) (citation omitted). Blalock has provided no legal, factual, or policy-driven basis for his claim that he should have been immediately transferred to another prison based only on his

general allegations of fear of attack from an unidentified gang member who may or may not have been present in the prison.

In sum, Blalock has failed to adduce any evidence that Superintendent Rivello knowingly and unreasonably disregarded an objectively intolerable risk of harm to Blalock. The court, therefore, must grant judgment in Rivello's favor.

### 4. Defendants Corley, Spyker, Kohler, and Strait

Blalock's failure-to-protect claims against Lt. Corley, DSCS Spyker, DSFM Kohler, and CCPM Strait withstand Rule 56 scrutiny. The record reflects genuine disputes of material fact as to what information was relayed to these Defendants and what action (if any) they took in response.

As to Lt. Corley, there is conflicting evidence regarding what information he was given and when that information was provided. The grievance documents indicate that on April 21, 2023, Blalock told Lt. Corley that he feared being attacked by an unidentified gang member at SCI Huntingdon who had previously assaulted him on two occasions, once in the community and once while in prison. During his deposition, however, Blalock attested that during this initial encounter, he had given Lt. Corely the inmate's first name, physical description, and nickname. (See Blalock Dep. 19:19-20:15, 22:14-18). Although Blalock's deposition testimony appears to be directly contradicted by his own grievance documents, at the summary judgment stage, the court does not weigh the

evidence and instead must view the evidence "in the light most favorable to the non-moving party" and "draw all reasonable inferences in that party's favor." Thomas, 749 F.3d at 222.

The only evidence that Defendants have proffered regarding what—if anything—Lt. Corley did in response to Blalock's claim of fear of a potentially deadly assault is that Lt. Corley "recommended to Plaintiff that he remain in the RHU until he completed his investigation." (See Doc. 65 ¶ 14 (citing Doc. 1-2)). Yet that assertion is based only on hearsay contained in A. Eberling's initial grievance response. (See Doc. 71-2 at 3; Doc. 1-2). It also appears to be contradicted by that same grievance response insofar as Eberling states that Lt. Corley admitted to him that only the PRC can decide to release a prisoner from the RHU to general population. (See Doc. 71-2 at 3). There is also no evidence that Lt. Corley investigated Blalock's claims. See Young, 960 F.2d at 363 n.23 ("Prison officials, therefore, are not required to provide protective custody to every inmate who asserts he was assaulted or threatened. Nonetheless, prison officials should, at a minimum, investigate each allegation of violence or threat of violence."). Thus, there is a genuine dispute of fact regarding whether Lt. Corley knew of and recklessly disregarded a risk of an inmate assault on Blalock.

The same holds true for the PRC members—Spyker, Kohler, and Strait. There is conflicting evidence concerning how much information they were given

by Blalock regarding his fear of assault. In his deposition, Blalock averred that during his July 2023 review, he told the PRC members exactly what he had told Lt. Corley. (See Blalock Dep. 23:19-24, 24:4-9). He further attests that when the PRC members told him to report this information to security and he responded that he had already done so, they simply stated it was "out of their hands." (Id. at 23:24-24:2).

There is no other record evidence regarding what, if anything, the PRC members did in response to Blalock's claim of fear of assault. Defendants assert that the PRC members continued him on DC status and did not send him to general population. (Doc. 65 ¶ 18). Yet this appears to be a continuation of the DC time that was not set to expire until January 20, 2024. (See Doc. 71-2 at 20). In fact, in the PRC's DC-141, Part III review, it states, "Inmate had no concerns," (id.), which is of course contradicted by Blalock's deposition testimony regarding what he told the PRC members during the July 2023 review.

Consequently, there remain genuine disputes of material fact regarding whether Corley, Spyker, Kohler, and Strait were aware of a substantial risk of serious harm to Blalock and whether they knowingly and unreasonably disregarded that risk. Summary judgment as to these four Defendants will be denied.

## IV. CONCLUSION

Based on the foregoing, the court will grant in part and deny in part Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56 as more fully set forth above. An appropriate Order follows.

**Date:** 8/20/26

**BY THE COURT:**

**JUDGE JULIA K. MUNLEY**
**United States District Court**